Thank you, Your Honor, and may it please the Court. My name is Sean Gallagher and I appear this morning on behalf of Harrison Medical Center. I'm going to try to reserve at least five minutes for rebuttal. The issue before the Court today is whether a plaintiff who filed a False Claims Act claim to establish that she had committed no Medicare fraud is protected under the anti-retaliation provisions of the Act, even if there was no showing that such a claim would be viable. Here, Ms. Cook, concerned that she might have unknowingly committed Medicare fraud, was asked at trial what was the purpose in filing the QTAM claim. And she answered, to clear my name and my work history that I committed no Medicare fraud. There are two reasons why this Court should reverse the judgment in favor of Ms. Cook and remand the case for further proceedings. First, Ms. Cook cannot recover for blowing a whistle on herself because she lacks scienter. Second, Cook was not engaged in conduct that is protected under the False Claims Act. But first, Cook cannot recover for blowing a whistle on herself. Counsel, your time is ticking. Forgive me for interrupting, but of course her brief says she wasn't, that that's not her theory, that she blew the whistle on herself. Her brief says that she blew the whistle on Ms. Manuel. So do you want to speak to that? Yeah. First of all, corporations can only act through their individuals. So obviously the Manuel can't, you know, can't be a relator. Yes. But in terms of, so what's wrong with, I mean, we're looking at a, this went to the jury. This isn't summary judgment. Yes, yes. So they, and you're not challenging an instruction. The jury found that she subjectively and objectively had this belief. Correct. That false billings had been submitted, I guess. So, so is the theory, was the idea that she noticed this discrepancy or it was called to her attention and she said she'd been following, very clear in her testimony that she'd been following the Manuel. So why couldn't it be the theory that her suspicion was that something was up, that false, right, and that she'd been unwittingly a part of that scheme by following those directions? What, what, why wouldn't that work? It would be unusual. Well, it doesn't work because it's not a False Claims Act retaliation claim. It's probably a great public policy discharge claim. But it's not a False Claims Act retaliation claim. And the reason that it's not is because the False Claims Act requires that the underlying claim be viable and that the plaintiff's belief, the would-be relator in that situation, that her belief be objectively reasonable. It doesn't have, of course, a false claim doesn't have to have been submitted, which you know because your brief is clear about that. Okay. Viable. You argue a lot in your briefing that it wouldn't, it was not reasonable for her to think this because, right? Yes. But Mielke did testify that the N, NGen, Gen N? Gen N. Gen N. Gen N. Gen N. Software was used in generating a final billing, he said. It did generate the final billing. So, you know, sort of a step before, which is a little different than. Well, a couple of reasons. First of all, you cannot be in the False Claims Act context both a relator and the fraudster. You can't be the person that performs the act that is supposedly illegal and then be the relator in the underlying False Claims Act claim to recover. And so. That's the argument you make in your brief repeatedly. And I'm asking you to posit this a little differently. Why couldn't it be, because I'm not arguing that point with you. Certainly. Why couldn't it be the case that this discrepancy was called to her attention and she testified pretty vaguely later in the trial that she thought somewhere in the system fraud could be happening and she may just have been seeing an indication of it. Well, first of all, when she testified about John Miyake, she was absolutely clear about what she believed Mr. Miyake did and did not do. She was asked, did you believe that he committed fraud, and she said she couldn't say one way or another. She didn't know. Right, right. So there was no affirmative evidence that she thought he committed fraud. He doesn't have to be the one committing fraud. I think the difficulty I'm having is that when we're looking at subjective belief, we're looking at whether there could be a potential claim. And when you add potential claim to the standard of review, you get pretty far out there in terms of you having an uphill battle to overturn the verdict. So my concern is that the picture she's painting in her testimony is that she believed, given what she was starting to see, that there was something wrong in the system that was really the company's fault, not her fault, but that she was going to get tagged with it. That may or may not be true, but why isn't that enough to be a subjective belief? Well, Your Honor, remember, the test is really both subjective and objective. Correct. Certainly, if she says she had a reason to believe that there was a problem with the software, that's a subjective opinion that she had, and there certainly is record evidence that would support, you know, her testimony about her subjective belief. But that's only one of the two tests that have to be satisfied. It does have to be objectively reasonable. That's, you know, from the Haygood case and cases that cite it more and others, it's absolutely clear that the belief has to be objectively reasonable. Weren't you told by Karen Holland and Diane Wasson that there are big problems here and it's fraudulent and maybe Medicare, Medicaid got overbilled? Well, there is testimony that at the meeting that she had with Ms. Wasson, Ms. Wasson mentioned that there was a concern about fraud. But, again, I come back to the – Here's what I think Diane Wasson said at that meeting. We've been working on some things. I don't think you've described them adequately, pointing at Ms. Cook. We're finding that there are big problems everywhere. They're very serious. I believe they are fraudulent. Why isn't that enough? Because there was no record evidence at trial to tie that to a fraudulent submission to the government. What they were talking about were inaccuracies in internal reporting. There was no evidence at trial about how Harrison went about submitting claims to Medicare, whether any Medicare claims were in fact fraudulent. There was no evidence whatsoever to connect the operation of this gen end software with the submission of a claim. And, of course, there doesn't have to have been a false claim submitted. But she does have to have thought something was up. She has to have had a subjective and a reasonably objective suspicion at least. So my understanding of the chronology is part of the problem. This discrepancy was called to the plaintiff's attention. The plaintiff was asked to investigate rather than following up on her own hunch. And then reports back and realizes she's generating the report daily and that was a mistake. The testimony is very clear she never had any fraudulent intent. Clearly agreed with that. And then upon her report to the supervisor, it's the next morning that you get to the point Judge Hawkins is describing where her supervisor's reaction clearly seems to me frightened her, that they suspected fraud. Is that part of the problem? I mean, at that point, it seems like it was reasonable for her to be frightened that there may have been fraud somewhere afoot. But remember, that was after the initial contact, the initial discussion she had with Ms. Wasson. There's no testimony that there was any discussion of fraud. Then she went out and she called the helpline, the McKesson helpline. And then she came back and reported to Ms. Wasson in her testimony. Wasson denied that, but obviously we're here before the court on the record in the light most favorable to the plaintiff. The plaintiff at that point testifies that Ms. Wasson mentioned fraud. Now, the court's absolutely correct. That may well satisfy the subjective standard. We're not suggesting that Ms. Cook was lying about what she felt. Certainly there's record evidence to support that there was a subjective belief. It's the objective component, too. Remember, it's a two-part test. And an objective person, remember, Ms. Cook had 37 years of experience as a medical billing specialist. She was in management for 11 years. A person in that position could not reasonably have believed that she had a viable false claims act claim. Because she would be both the relator and the fraudster. But more important, she lacked this requisite scienter. In order to bring a fraud claim, you have to act knowingly. But not if she thinks, that's why she's saying that she didn't commit fraud, right? But that she thought, I think the theory is that she stumbled into it. And hence the question, did you think that your predecessor who wrote this manual that you were following, did you think he had fraudulent intent? Right, and she said she didn't know. She said she doesn't know. Was she ever asked, counsel, whether she suspected anybody else? Yes, and her testimony was that she did not. Do you have the ER site for that? Yeah, I will, yeah. Or the transcript site. Yeah, 202, ER 202, lines 13 to 16. She cannot identify anyone at Harrison that she thinks intentionally committed Medicare fraud. Was she ever asked directly whether she thought false claims were submitted, that it actually happened? I don't know, Your Honor. We could check the record and supply a... You know, I guess that's what struck me on both sides, is the, you know, $100 million questions were never asked by either side that would pinpoint. I mean, I'm looking at this, they ask, well, did you think, you know, Mr. Miyake or whomever committed fraud? No, I couldn't say one way or the other. But that doesn't really answer any questions. So when you're looking at what the elements are, I was just struck that neither side really pinpointed and asked those questions that were critical to the defense or the claim. Your Honor, I see that I'm running low on time. If I could briefly answer that question and then save some time for a vote. She's absolutely clear she does not know whether Mr. Miyake committed fraud. Now, remember, the plaintiffs bear the burden of proof here. See, that's a piece of evidence, but it doesn't tell you the whole story. And so then I was curious why in your Rule 50 motions you focused almost primarily on her subjective belief. And yet not what you're now arguing as being the key issue, which is the objective belief. And one simple reason, Your Honor, that we had already moved under Rule 56, the motion for summary judgment, on that ground and the judge had denied that motion. In the Rule 50 motion, first of all, we're not required to raise every issue that we had previously raised on summary judgment. You basically pick which arrows in your quiver you think are going to have the best shot. And the argument that the court just articulated had been raised and shot down on summary judgment. That was before trials. You want to save the remaining time? My understanding is that Ms. Cook was compiling this report daily. And at the end of the day, it turned out it should have been done monthly. That's correct. Could compiling it monthly have resulted in inaccurate information given the government? There was testimony. No, it could not. I'd like to reserve the remaining time for rebuttal. Thank you. Good morning. May it please the Court. I'm Dan Weisskopf with me at counsel tables. Theresa DeMonte, we represent the appellee Laurie Cook. Counsel, can you tell me what your theory was at trial? Where's the evidence that supports the elements going to fraud? Sure. So the theory, I was not trial counsel. But it was not that she was blowing the whistle on herself. Ms. Cook testified repeatedly. Your brief is clear on that. And it says she was blowing the whistle on the manual. What does that mean? So she was blowing the whistle. She found information during this investigation that there were a number of elements going on. There were a number of factors going into what she discovered. And if I could just give 30 seconds of context, I think that would be helpful. A new finance director comes in to Harrison. Suddenly the books don't add up. Everyone's very concerned. There's a report showing overbilling on a Medicare report. Ms. Cook is told to investigate this. She investigates this. And she discovers this manual. It's an in-house manual, which means they didn't just, it's an off-the-shelf package and they have an in-house manual that says. And she's following the directions and she's adamant she followed the directions to the letter and the manual disappears and we've all read the brief. So what's your theory? So the theory is, yes, I mean, she did not, and I agree with there was no testimony on who did it and who's responsible, the who, what, when, where of fraud was not testified to. It's not in the record. But she doesn't need to have that. All she needs to have is a reasonable belief. That fraud was actually committed. She has to think it's really happening. Right. What did she think? And again, OK, so there was no fraud. I mean, at the end of the day. So to you, there's there will not be proof of and I apologize that I'm not answering the question, but there will not be proof of fraud. I mean, she can she can speculate after that. What was her theory that she had a hunch about about what was happening? She has to have had a legitimate good faith belief that that I'm filling that blank for me. That the company was somehow that someone was skimming off the top, that it could have been Miyoki. It could have been someone else that she was getting instructions to bill a certain way that those were affecting final claims and that there was money that was getting that was getting even though she was in a position to know. And she testified very clearly that she know that knew that that software didn't generate a bill that was submitted to the government. She did not. The testimony on this is that she believed and this is at ER 240. When you press the gen and function key or radio button, did it appear to affect revenue? Yes. No one told you differently. Right. So she did not. And there's more along those lines. Miyoki had said that that Jenin could lead to a final claim. She didn't know. She didn't know how Jenin affected things. All she knew, she's pressing a button called affect revenue. She's being instructed to do it the wrong way by the company and that there's this missing money. And this new finance director is coming in and saying there's missing money. And the reasonable belief standard. I mean, it's it's it's not even a reasonable belief of fraud. It's reasonable belief that they could be committing fraud. I mean, it's a very the jury would have had to find it would be doing it. And again, it would be perhaps it was Diane Watson. Perhaps it was Miyoki. Perhaps it was someone else. When you were concerned with fraud, did it reflect the whole department or just not just you personally? And she said it would reflect the whole department. So we don't know. And I and she doesn't have to know that the case law is incredibly clear, at least from my perspective, that that and especially under the new fear of 2009 amendments, any act, any act is protected. She does not. You can't expect someone or want to have a policy where someone you can fire them quickly before they figure out the fraud and you're off the hook before they understand it. They don't have to put together the pieces. All they have to do is believe that reasonably believe that what they're doing is to help stop fraud. Reckless billing is also part of the center. And this could clearly I mean, the theory could also be that this was reckless billing, that there was no reasonable steps taken to make sure that the claims were accurate. And so all she has to know and believe is that she is working towards that goal and that she tells her employer that she's working for you. Satisfied that what's the proof of that? It was objectively reasonable that it was that it was objectively reasonable. Sure. So and again, objective reasonableness is it's a constellation of facts. It looks at her experience, it looks at a whole lot of different things, and it's ultimately trying to get into her mind. And it's a jury question. You agree with your opponent that it made no difference in terms of the accuracy of information going to the government, whether this report was done daily or monthly? I believe that that's the record shows that there was an investigation done by McKesson and that they determined that there are yes or no in there somewhere. I believe I agree with that. There was no there was no fraudulent billing. And that was the concern at the end of the day that she had been compiling it daily instead of monthly. That's correct. But again, but at the time she was doing this, no one knew whether the daily was going to skew the report. Exactly. Nobody knew. So she's she's not she did not put together all the pieces of the fraud. She did not understand who went where when. All she did is she said this is concerning. We can't add up the books. She went she found something saying do this the wrong way on effect revenue, pressing effect revenue. And she believed that she could be causing the government to be misbilled and that she could be doing it because it was something that I would feel a lot better if she said that. Can you point on page isn't it isn't this your client's testimony on page one ninety five where she says the gin and is just an internal process? I believe she say all of what you just said about believing that this could be affecting the final process. She had that belief. E.R. two forty. OK. As I believe our best site on that. OK. Thank you. And it says when you press the gin and function here radio button did appear to affect revenue. And she said yes. No one told you definitely right. And so that was what she was operating under. And and I think that the other piece of evidence the jury supposed to figure out what would a reasonable person in her shoes believe and that no person reasonable person could believe that this was fraud. But we don't have to guess at what another reasonable employee in her situation would have thought because we have Miss Watson's testimony and where Miss Watson's test. Right. I'm looking for your client's test. All right. But but another employee are we talking about reasonable belief. Another employee looked at these same facts and and said there's fraud here. And E.R. three thirty three to thirty four I think is just very key testimony of Miss Watson's where she describes the conversation with Laurie Cook. And and she says that when Laurie Cook brought this information to Miss Watson it was a revelation. And actually there's a type on there says revolution twice but it's got to mean revelation. So this was a revelation that every account balance has been misrepresented. So Miss Watson when she got this information said every account balance has been misrepresented. And and her counsel said what do you mean it's been misrepresented. Which account. She said everyone was misrepresented during this time period. And Miss Watson's notes at E.R. four ninety four mirror this testimony. So and then Miss Watson goes and gets a fraud investigation goes gets an external McKesson to come in and do a fraud investigation. Says I confirm it appears that there's fraud here. And so another person looked at this and had the exact same reaction as Miss Cook. And so I think that that is evidence that that's in there's cases to support that is evidence that can that can that the jury can consider. In terms of who was some of the questions about who was committing the fraud and can you blow the whistle on yourself. The way and it's a pound of bananas is actually getting weighted at one point one and they're charging people. The clerk doesn't know when they press way that they're committing fraud. But you know the store is committing the fraud. The clerk is just the unwitting cog in the fraudulent machine. So you submitted a twenty eight letter for that goes to the notion that there's now authority in a different circuit that it's possible to blow the whistle on yourself. Is that your theory or not. Are you changing your theory. What am I going to do with that 20 letter. Oh no. That was not supposed to change change the theory at all. That was just saying that if even if you were a knowing participant that the blanket rule put forward by the appellant that you can never be a part of a fraud and blow the whistle on yourself. That's not you can be part of something. That wasn't your theory. But that was not. And it's not your theory today. No she she had absolutely was not a part of this. She was to the side repeatedly. It was not. She had no intent to commit fraud. And she was she was just following the instructions to a T. I can I can continue with my argument unless there's further questions. It's a very unusual case with respect to the False Claims Act particularly with the timing. So everything's compressed into one day. Does it matter what happened that day and the next day. Does it matter anything that happened after those two days. I would submit no. I mean for atmospherics it would change things. But in terms of the 3729 and 3730H the two statutes and this is something where I think it gets mixed up in the briefing of appellants. 3729 is the relator bringing forward a fraud claim. There you need to prove up fraud. You need to prove C enter. 3730H you just have the reasonable standard. 3730H protects the investigation. It doesn't protect against fraud. And so and it protects all ranges of investigation. I mean just as long as you're turning over a rock with the thought that you're going after fraud and then the next rock and the next rock. Does it matter that your client wasn't doing that. I mean her testimony is not that she had a hunch and she was following up and her hunch is that someone else called this to her attention as Judge McEwen said in one day. Over the course of one day she was directed to go follow up. And she talked with Tiffany on the helpline several times and then reported those results back as opposed to the typical much more typical whistleblower who thinks he or she might be on to something. Does that matter. I don't think that there's any case law or or policy reason why you would if you say to an employee go figure out what's going on here. The employee comes back and says I've got it. It's fraud. I figured it out. And they say you're fired. Well your client didn't say that. Your client did not come back and say I've got it. It's fraud. Correct. But I'm just saying well she came back and said and I agree that the testimony is a little. Came back and said I made a mistake and she's clear she was she never had fraudulent intent. I've been mistakenly running this every day. Tiffany's explained this to me. She did not according to our testimony of the site's testimony she did not say I made a mistake. She said I've been doing everything exactly exactly accurately. Harrison has been instructing me to do things. Why is that different in the context of what we're talking about here. She's adamant she had no fraudulent intent. She was following the instructions on the man to the screenshots again. You know we've read the briefing doing exactly what she was told and she realizes Tiffany has told her now. Oops that really that mistake. That's a mistake. The report is intended to be run monthly because she thought that she had this change that your answer because she thought she had discovered potential false and she doesn't have to use the word fraud or her theory really was that what she was doing was incorrect. That was the problem. Not that somebody else somewhere in the system was was monkeying with the process. No that she her theory was that somewhere in the system and she doesn't know who what where when why she doesn't have to. But at some point someone created a system which had her pressing effect revenue too frequently billing in the wrong way. And this is in the context of there's missing money and we're trying to figure out why it says there's this overcharge report for Medicare. At the end of the day if an employee this is hypothetical points to a problem that they believe could involve fraud and an honest investigation is done. This is hypothetical. And the conclusion of the investigation is there's nothing fraudulent but your employee is incompetent and the employee gets fired for lack of competence. How can that fit within the FCA. And that is the case that Harrison put on a trial. They put on this case about about she was a terrible employee despite all of her good reviews. They said that she messed this up that there was the manual was a mistake. It wasn't assuming my hypothetical is a perfectly good employee. The employee comes to supervisors and says I think there's a problem here and it may be resulting in inaccurate information going to the government. Fine. We'll look into it. They look into it. They conclude there's no problem with the processes. The problem is the competence of the employee. Correct. That's a fraud FCA claim. If the employee thought that they were investigating fraud and the company knew that they were investigating fraud or something along an FCA claim and they fired them for that investigation that would fall within the False Claims Act. Is there any evidence in this record that would contradict the reasons the employee the company discharged her? She had excellent. Namely that she didn't process this information correctly. Competently. So I might not be fully understanding your question. I hope I can address it. She had excellent employee reviews forever. She investigated this material. She went to Dianne Wasson. Dianne Wasson said yes there's fraud here. I agree. And then the next morning she suspended. You know if this is wrongful discharge I've got no problem with that. Counsel in response to Judge Hawkins question you just said an important thing I think. You said if she thought she was investigating fraud and my understanding is that she didn't think that or have reason to think that until she reported back to Dianne Wasson who reacted very dramatically. And again she doesn't need to I didn't want to use she doesn't have to be thinking the F word of fraud. She just needs to be thinking that there is some possibility that the government is getting charged. Okay. Where's the record that she saw in the course of that one day period before the meeting where she reported back where is an indication that she thought that might have been something fraudulent afoot? ER 155. And that tells me that when did she have that thought? Going back to when you were asked to investigate both the monthly credit report and the McKesson overpayment report issues did you believe they had fraud potential? Yes I believe they would have fraud potential. And ER 423 where she testifies that the first meeting on November 6th she thought there was a fraud implication. Is the first meeting on November 6th? Yes I'm sorry. And that's the meeting between whom and whom? That's when Wasson goes to Cook and says we've got a problem we've got to figure this out. All right. Thank you. Thank you. Thank you very much for your time. I want to begin with addressing the question Judge Hawkins that you posed. And I think one of the things that the Court is struggling with here is that the plaintiffs might have presented a very strong case for public policy discharge or some sort of other wrongful discharge claim under State law. But that was never pled. What was pled was a False Claims Act claim. And I would suggest that stretching the False Claims Act to cover areas that would be otherwise covered by State law claims is starting this Court down a very slippery slope. Because essentially if the plaintiff wins in this case, depending on how the opinion is constructed, it could mean that employers are faced with a very, very difficult situation. Faced with a situation in which if an employee subjectively believes that they've got a fraud claim, regardless of whether there's any reasonable basis for that, employers have to be concerned about dealing with those kinds of issues. But if you do have to meet the second prong, and that's the objective prong. Yes. So if both of those are met, you may well have a State law and a Federal law claim. If both of those are met, you may. And our position is obviously that both are not met, that there is no objective basis. And it's because of Scienter. Now, I want to point the Court back to the focus on what was Ms. Cook investigating. The salient testimony is at page 202 in the record, page 149, page 223, 224, and 225. It is absolutely clear from the record that Ms. Cook was investigating her own conduct. She was investigating whether she may have unknowingly committed fraud. She filed the False Claims Act claim, she testified on page 223, to clear her name. She asked the Department of Justice to investigate to determine, to clear her name. That's on page 224. On page 427, she said she was, what was your concern? Her concern was that she may have committed fraud. I see I'm out of time. If I may be allowed just perhaps two more minutes to complete my rebuttal. You can sum up, yes. Sum up, but don't repeat. That's the challenge, and I will do that. This is a case in which the plaintiff has simply failed to establish the requisite elements of Scienter. It is, we would suggest that the court, as it is done, look very closely at the record, very closely at what her testimony is, and that the court reverse the judgment, or reverse the judgment of the district court and remand it for proceedings under Rule 60B-5 to address the award of attorney's fees. If there are no further questions, I thank the court. Thank you very much.
judges: Hawkins, McKeown, Christen